**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



**Dated:  June 28 2024**

John P. Gustafson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.  23-60403 |
| | ) | |
| Jason M. Ramus, | ) | Chapter 13 |
| | ) | |
| and | ) | |
| | ) | Judge John. P. Gustafson |
| Mackenzi E. Ramus | ) | |
| | ) | |
| Debtors. | ) | |

<u>**MEMORANDUM OF DECISION AND ORDER DENYING MOTION TO DISMISS
CASE PURSUANT TO 11 U.S.C. § 109(e)**</u>

      This case comes before the court on U.S. Trustee Andrew R. Vara's ("UST") Motion to Dismiss Case pursuant to 11 U.S.C. §§109(e) and 1307(c) ("Motion") [Doc. #352] and Debtors Jason M. Ramus' and Mackenzi E. Ramus' Response to UST's Motion [Doc. #371].  After an initial hearing on the Motion held on April 17, 2024, the court instructed the UST to file a final brief on the case law regarding 11 U.S.C. §109(e), and any response to the UST's brief by May 3, 2024 [Doc. #380].  In its Motion and Supplemental Brief Supporting its Motion ("Brief") [Doc. #384], UST asserts that Debtors' case should be dismissed based on the debt limits set forth in 11 U.S.C. §109(e).

1

The court has jurisdiction over Debtors' Chapter 13 case pursuant to 28 U.S.C. §§1334, 157(a), and Local General Order 2012–7 of the United States District Court for the Northern District of Ohio. The determination of a Chapter 13 debtor's eligibility is a core proceeding that this court may hear and determine. 28 U.S.C. §§157(b)(1) and (b)(2)(A) and (O).

## FACTUAL BACKGROUND

Jason M. Ramus ("Debtor-Husband") previously held the position of Vice President of Business Development and National Wholesale at AEM Services, LLC ("AEM Services"). There has been no evidence – or even a proffered assertion – that Debtor-Husband had any equity interest in AEM Services. AEM Services, allegedly founded and controlled by Mark Dente, represented that it was engaged in real estate wholesaling and "flipping" activities. However, it is alleged that AEM Services actually operated a Ponzi scheme,[1] where investments were solicited under false pretenses to sustain the scheme rather than for legitimate real estate transactions. It is further alleged that Debtor-Husband actively participated in soliciting investments for AEM Services, drafting investment documents, and benefitted from the scheme's proceeds.

AEM Services appears to have collapsed in May 2022. Subsequently, numerous investors pursued legal action against AEM Services and its executives, including Debtor-Husband, in the Summit County Court of Common Pleas. The cases involved claims related to unpaid investments, alleged torts committed by AEM Services executives, and requests for the appointment of a receiver. At the time of the filing of this Chapter 13 case, none of those cases had resulted in any kind of judgment against Debtor-Husband.

Debtor-Husband has maintained, throughout this case, that while he held the position of "Vice President of Business Development and National Wholesale" at AEM Services, and invested in the company, he was not privy to information about any scheme or fraudulent activities. [Doc. #371, p. 1]. He asserts that he was directed by Mr. Dente to draft investment documents but was not involved in corporate decision-making nor was he provided access to financial records. [*Id.*, pp. 1-2]. He claims he knew nothing of the Ponzi scheme or its operations, and points to the fact that he continued to work at AEM Services even after a receiver was appointed. [*Id.*, p. 2].

---

1/ The term "Ponzi scheme" derives from the Supreme Court's description of "the remarkable criminal financial career of Charles Ponzi" in *Cunningham v. Brown*, 265 U.S. 1, 7, 44 S. Ct. 424, 68 L.Ed. 873 (1924). The phrase is generally applied to any fraudulent arrangement whereby earlier investors are repaid from the contributions of later investors.

2

These events culminated in legal proceedings consolidating the cases under one state court judge due to overlapping legal issues. Additionally, on or about June 22, 2022, a receiver, Mark E. Dottore, was appointed to manage AEM Services and related entities to recover investors' losses resulting from the Ponzi scheme. [Doc. #344, p. 1; Doc. #352, p. 3]. At the time of the hearing on UST's Motion to Dismiss, it did not appear that any criminal charges had been filed on the alleged Ponzi scheme.

On April 7, 2023, the Debtors initiated this case by filing a voluntary Chapter 13 bankruptcy petition under Title 11 of the United States Code (the "Bankruptcy Code"), accompanied by schedules and a statement of financial affairs. [Doc. #1]. The initial filing was 355 pages. [*Id.*] Debtors' Schedules listed secured debt of $413,662.77, no priority unsecured debt, and nonpriority unsecured debt of $344.75. [*Id.*, pp. 1, 14-238]. Thus, the total debt would be $414,007.52. Relevant here, Debtors' Schedule E/F, "Creditors Who Have Unsecured Claims," lists 701 unsecured nonpriority claims, with all but one of these claims stemming from investors involved in the AEM Services litigation (the "Creditor Investors"). [*Id.*, pp. 21-255]. The Debtors designated these claims for "notice purposes," valuing them at "$0.00" and marking each of the "notice" claims as "Contingent," "Unliquidated," and "Disputed." [*Id.*].[2] Additionally, Debtors listed a secured debt, their mortgage with Huntington Mortgage, on Schedule D. [*Id.*, p. 20].

Of the 701 listed creditors, 27 claims have been filed in this case. *See*, Case No. 23-60403, Claims Register.

On April 19, 2023, the Debtors filed the First Amended Chapter 13 Plan ("Amended Plan"). [Doc. #14]. The Amended Plan proposed a monthly payment of $5,110 for sixty months. This amount would be used to pay the mortgage as conduit, the Chapter 13 Trustee's fees, and the single unsecured debt that was not listed "for notice purposes." [*Id.*]. The Amended Plan did not address the Creditor Investors' claims specifically, instead stating that nonpriority unsecured creditors would receive at least as much as they would receive in a Chapter 7 liquidation. [*Id.*].

Various creditors, including the Creditor Investors, filed claims totaling $21,225,199.99 in the bankruptcy case. [Claims ##1-1 through 5-1, 7-1 through 14-1, and 16-1 through 27-1]. The Debtors objected to all of the claims by the Creditor Investors as well as the claim of the Receiver. [Docs. ## 62-110]. On two separate dates, the Court sustained the Debtors' objections on eleven

---

2/ The "notice" claims (all claims other than the undisputed credit card debt listed in the amount of $344.74 [Doc. #1, p. 65]) are referred to in UST's pleadings as the "Remaining Claims." [Doc. #352, p. 5].

claims by Creditor Investors based on the lack of any filed response and/or appearance at the hearing. The following eight claims were disallowed by court orders entered on September 19, 2023: Claim No. 23 [Doc. #171]; Claim No. 2 [Doc. #172]; Claim No. 3 [Doc. #173]; Claim No. 4 [Doc. #174]; Claim No. 8 [Doc. #175]; Claim No. 15 [Doc. #176]; Claim No. 16 [Doc. #177]; and Claim 17 [Doc. #178]. Three additional orders sustaining Debtors' objections to claims were entered on October 26, 2023, disallowing: Claim No. 7 [Doc. #246]; Claim No. 13 [Doc. #247]; and Claim No. 27 [Doc. #248].

By the UST's calculation, that left fourteen remaining claims (the "Remaining Claims") totaling $18,083,969.57. [Docs. ## 171-78, 246-48].

On March 21, 2023, Proof of Claim No. #23 was withdrawn by claimant's counsel [Doc. #357], along with Proof of Claim No. 12. [Doc. #358]. On Mach 25, 2024, three additional claims were withdrawn. *See*, [Doc. #366] (withdrawing Claims Nos. 11, 10, and 9). These three claims had been for $100,000 each. [Claims Register, 9-1, 10-1, 11-1]. Another withdrawal, of Claim #22 for $768,019.50, was also filed on March 25th. [Doc. #365]. All of the remaining Creditor Investor claims continue to be subject to Debtors' Objections.

The largest remaining Proof of Claim, Claim No. 24, was filed by SP Investment Services, LLC for $11,168,838. The Receiver has stated, in a pleading filed on a related matter: "Additionally, the Receiver is preparing actions against the professionals and institutions that aided and abetted AEM's fraud, including SP Investment-Services, LLC, who are masquerading as victims and creditors of this bankruptcy estate." [Doc. #370, p. 4].[3]

The Debtors sat for a deposition by the Receiver on December 11, 2023. [Doc. #253, Notice of Deposition of Mackenzie [*sic*] E. Ramus; Doc. #254 Notice of Deposition of Jason M. Ramus]. All of the Creditor Investors were permitted (and encouraged) to attend. The UST did not attend the Debtor-Husband's deposition. Debtors assert that: "At no point in the deposition did either debtor invoke their respective Fifth Amendment rights. The Debtors fully and completely answered every question that was asked." [Doc. #371, p. 3].

Subsequent to these developments, negotiations between the Debtors, the Receiver, and other parties continued, culminating in a Joint Motion to Approve Agreed Order Settling

---

3/ In addition, the SP Investment Services, LLC proof of claim reflects that the amount includes "lost profits," which have been held to be unliquidated for purposes of §109(e). *See*, *In re Salazar*, 348 B.R. 559, 570-71 (Bankr. D. Colo. 2006).

4

Controversies and Modifying the Automatic Stay (the "Settlement") filed on March 6, 2024, seeking court approval for an agreed settlement. [Doc. #344]. The court has not yet ruled on that Joint Motion.

Amid these proceedings, UST filed a Motion to Dismiss on March 18, 2024, more than 11 months after this Chapter 13 case was filed,[4] alleging bad faith and that the Debtors' case violates 11 U.S.C. §109(e) because it exceeds the debt limits for a Chapter 13 case. [Doc. #352].

The UST asserts that Debtors have more than $2,750,000 in noncontingent, liquidated debts, and are thus over the debt limit imposed by 11 U.S.C. Section 109(e).[5] [*Id.*, p. 13]. The Motion to Dismiss argues that tort claims accrue at the time the tortious conduct takes place, and that the alleged prepetition conduct should therefore be held to be noncontingent, even though they are not reduced to judgment. [*Id.*, p. 14]. The Motion further asserts that these notice debts are "liquidated" because they are "readily ascertainable" or "can be determined by mathematical computation," citing *In re Pearson*, 773 F.2d 751, 754 (6th Cir. 1985). [*Id.*, p. 15]. While the schedules reflect debts well under the §109(e) debt limit, the UST urges the court to look at the filed claims in the case instead. [*Id.*, p. 16].

The UST point to the fact that: "All the Remaining Claims are based on AEM Services's failure to pay back to the Creditor Investors the cognovit notes with promised profit. All these notes were executed prior to the petition date and, thus, any duty to pay also arose before the petition date . . . ." [*Id.*] These notes, for amounts lent by the "Creditor Investors" to AEM Services, were reflected in notes that were attached to their filed proofs of claim. [*Id.*, p. 16].

The UST concludes with the statement: "Given that the Remaining Claims are worth $18,084,969.57, much higher than the debt limit of $2,750,000 imposed by Bankruptcy Code §109(e), and that those claims are both noncontingent and liquidated, the Debtors are ineligible for chapter 13 and their case should be dismissed." [*Id.*, p. 17].

---

4/ It is not just the length of time that is concerning. Courts have held that failure to file an eligibility challenge prior to a hearing on confirmation is problematic. *See e.g.*, *In re Lochamy*, 197 B.R. 384, 387 (Bankr. N.D. Ga. 1995)(motion to dismiss based on Chapter 13 eligibility that was filed five days before confirmation hearing was denied when case was confirmed without creditor raising the issue at the hearing.). Here, three confirmation hearings were held in this case prior to the filing of UST's Motion, on August 16, 2023; September 20, 2023; and December 20, 2023. However, the Plan was not confirmed at any of those three scheduled hearings. The Debtors have not asserted that the eligibility issue has been waived. *See*, *In re Kwiatkowski*, 486 B.R. 409, 413-14 (Bankr. E.D. Mich. 2013).

5/ Although the 2022 Amendment to Section 109(e) has lapsed, it was in effect on the date of filing, making the $2,750,000 undifferentiated (between secured and unsecure) debt limit applicable here.

After the hearing on the United States Trustee's Motion to dismiss on April 17, 2024, the UST was granted leave to file a supplemental brief in support of dismissal under Section 109(e). [Doc. 384].

## LAW AND ANALYSIS

11 U.S.C. §109(e) governs an individual's eligibility to file a case under Chapter 13 of the Bankruptcy Code. At the time of filing, it provided:

> Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated debts of less than $2,750,000 or an individual with regular income and such individual's spouse, except a stockbroker or a commodity broker, that owe, on the date of the filing of the petition, noncontingent, liquidated debts that aggregate less than $2,750,000 may be a debtor under chapter 13 of this title.

11 U.S.C. §109(e).[6]

The 2022 amendments to §109(e) were, in some ways, substantial. All of the previous iterations of the statute had made eligibility contingent on meeting both an unsecured debt limit and a secured debt limit. The bifurcated dollar limits had resulted in a substantial amount of case law dealing with what "bucket" certain debts should go in – either the secured bucket or the unsecured bucket. Courts struggled with how to treat under-secured first mortgages that could not be bifurcated,[7] wholly unsecured junior mortgages that could be stripped,[8] §522(f) lien avoidance rights,[9] and other loans that were partially secured.[10] All of that case law, which required courts

---

6/ The dollar amounts shown reflect the adjustment as set forth by the Judicial Conference of the United States. *See*, 11 U.S.C. §104. The relevant form of this subsection was enacted by the Bankruptcy Threshold Adjustment and Technical Corrections Act, Pub. L. No. 117-151 §2(c) (2022). *See*, 2 Collier on Bankruptcy, ¶109.06[2][a] n.27a (16th ed. 2024).

7/ *In re Munoz*, 428 B.R. 516, 518 (Bankr. S.D. Cal. 2010)(under-secured first mortgage treated as fully secured because first mortgage was non-modifiable).

8/ *In re Fuson*, 404 B.R. 872, 876 (Bankr. N.D. Ohio 2010)(second mortgage listed as wholly unsecured on Schedule D was treated as unsecured).

9/ *In re Scovis*, 249 F.3d 975, 983 (9th Cir. 2001)("a claim secured only by a lien which is avoidable by a declared exemption is unsecured for §109(e) eligibility purposes.").

10/ *In re Bowes*, 2009 WL 2983036 at *1, 2009 Bankr. LEXIS 2884 at *2 (Bankr. N.D. Ohio Sept. 14, 2009)("secured debt should be treated as unsecured to the extent secured creditors' claims exceed the value of their collateral."); *In re Holland*, 293 B.R. 425, 429 (Bankr. N.D. Ohio 2002)("this Court believes that, if directly confronted with the issue, the Sixth Circuit would not, in determining a debtor's Chapter 13 eligibility under § 109(e), divide an undersecured debt into its respective secured and unsecured parts.").

6

to second guess Chapter 13 debtors' schedules, was made unnecessary with the 2022 amendment that simplified the eligibility requirement by setting a total dollar amount limit, without regard to whether the debt was secured or unsecured.

In another important way, the statute is unchanged, counting only "noncontingent, liquidated debts" toward the dollar limit for Chapter 13 eligibility, as 11 U.S.C. Section 109(e) has mandated since 1979.

In determining whether a debtor is eligible to be a debtor under Chapter 13, courts are directed to rely primarily upon the debtor's schedules. The Sixth Circuit Court of Appeal's decision in *Comprehensive Accounting Corporation v. Pearson* (*In re Pearson*), 773 F.3d 751, 757 (6th Cir. 1985), states that a court tasked with determining an individual's Chapter 13 eligibility "… should rely primarily upon the debtor's schedules checking only to see if the schedules were made in good faith …."[11] *See also, Scovis v. Henrichsen* (*In re Scovis*), 249 F.3d 975, 982 (9th Cir. 2001); *NCI Bldg. Sys. LP v. Harkness (In re Harkness)*, 189 Fed. Appx. 311, at *3 (5th Cir. 2006)("Ordinarily, the bankruptcy court will not look beyond the amounts asserted by the debtor in the debtor's schedules in conducting the §109(e) eligibility analysis, unless it finds that the schedules were not filed in good faith."); *In re Frederick*, 2011 WL 5908957 at *2, 2011 Bankr. LEXIS 4577 at **4-5 (Bankr. E.D. Mich. Nov. 14, 2011); *In re Perkins*, 2009 WL 2983034 at *1, 2009 Bankr. LEXIS 2885 at *3 (Bankr. N.D. Ohio Sept. 14 2009); *In re Bowes*, 2009 WL 2983036 at *2, 2009 Bankr. LEXIS 2884 at *5 (Bankr. N.D. Ohio Sept. 14, 2009); *In re Odette*, 347 B.R. 60, 62-63 (Bankr. E.D. Mich. 2006); 2 Collier on Bankruptcy, ¶109.06[2][a] n.27a (16th ed. 2024)("[A] court should look beyond the amounts asserted by the debtor in the schedules only if it determines that they were not filed in good faith."). The *Pearson* Panel further held that "[t]he threshold eligibility determination for Chapter 13 is in many respects like the threshold subject matter jurisdiction determination in diversity cases …" and that an "extensive inquiry" would be

---

11/ The issue on appeal in *Pearson* was whether the bankruptcy court erred in relying on the schedules as initially filed by the debtor, without considering the amended schedules that the debtor subsequently filed to reflect the results of an arbitration where there had been an award, but that award had not been confirmed at the time of filing. *See, Pearson*, 773 F.2d at 751-52. The *Pearson* court held that: "[W]e believe it is wholly sufficient for the bankruptcy judge to have examined the petition and from that to have concluded that a good faith claim of eligibility was made. While the amount owed by the Pearsons to Comprehensive was probably established as $127,000 by the arbitration proceedings, it by no means indicates that the debt was unsecured to that extent or that the Pearsons would be ultimately held liable for that amount." *Id.*, at 758.

7

inconsistent with the language of §109(e) and its underlying congressional intent. 773 F.2d at 756-57.[12]

In applying *Pearson*, the *Perkins* court set forth the following framework for determining an individual's Chapter 13 eligibility:

> (1) the schedules are unquestionably the starting point of the eligibility inquiry, but may also be the ending point under certain circumstances; (2) the word "normally" used with respect to reliance on schedules implies exceptions for the proper application of a court's discretion so long as the determination focuses on determining debts "on the date of filing,"; and (3) given the need for parties in interest to know § 109(e) eligibility early in a case, the eligibility determination should not depend on the claims allowance process (based on the Sixth Circuit's quoting with approval a case that states that the court considers debts as they exist at the time of filing, "not after a hearing") and turn into separate satellite litigation that dominates and delays the Chapter 13 proceedings…. [A] court must [also] make an independent determination apart from Debtor's schedules whether debts are contingent and unliquidated.

*Perkins*, 2009 WL 2983034 at *2, 2009 Bankr. LEXIS 2885 at **4-5 (citations omitted).

While the schedules, as filed, reflect that the Debtors meet the eligibility requirements, the UST has challenged them, and the court will canvas the claims to make an independent determination if the claims of the listed "notice" creditors can be characterized as contingent and unliquidated. It is appropriate to conduct such a review, in part, because cases have held that characterizing a large number of debts as contingent or unliquidated "causes the court to question the accuracy of the characterization." *See*, *In re Perkins*, 2009 WL 2983034 at *2, 2009 Bankr. LEXIS 2885 at *5.

In conducting this review, it is important to keep in mind that the issue is whether or not Section 109(e)'s Chapter 13 debt limit for non-contingent and liquidated debts was exceeded at the time of filing. While subsequent events may cast light on the proper characterization and amount of the liabilities owed at the time of filing, a post-filing determination of the amount of claim, or liability on a claim, does not divest a Chapter 13 debtor of eligibility. *Pearson* is clear on that point:

> We therefore also agree with the bankruptcy judge, the district judge, and the rationale of the Supreme Court in the *St. Paul Indemnity* case that the fact that some

---

12/ The Sixth Circuit Bankruptcy Appellate Panel adopted the *Pearson* eligibility framework in the context of Chapter 12 bankruptcy. *See*, *In re Perkins*, 581 B.R. 822, 833 (6th Cir. BAP 2018)("*Pearson* cited limited debtor resources and short deadlines for Chapter 13 filings as important policy considerations requiring efficient Chapter 13 eligibility determinations. These policy concerns are as relevant for Chapter 12 debtors.").

8

later resolution of the conflict might render more certain the precise nature of the debt itself and the extent to which it is ultimately found to be secured is relatively immaterial in determining the debtors' financial condition and Chapter 13 eligibility on the date the petition was filed. The bankruptcy judge and the district judge both looked realistically to the state of the debtors' affairs as it reasonably appeared on the date of filing. We do not believe that the statute requires any more.

*In re Pearson*, 773 F.2d at 758; *see also*, *In re Ash*, 539 B.R. 807, 811 (Bankr. E.D. Tenn. 2015)("postpetition events may not be taken into account in determining chapter 13 eligibility."); *In re Smith*, 365 B.R. 770, 780 (Bankr. S.D. Ohio 2007); *In re Smith*, 325 B.R. 498, 502 (Bankr. D.N.H. 2005)("Eligibility for chapter 13 is not based upon postpetition events such as allowed claims, filed claims, or treatment of claims in a confirmed chapter 13 plan."); *In re Hansen*, 316 B.R. 505, 509 (Bankr. N.D. Ill. 2004)("Section 109(e) states plainly that eligibility to proceed under chapter 13 depends on what the debtor owes 'on the date of the filing of the petition.' Post-petition changes in what the debtor owes are therefore beside the point."); *In re Stairs*, 307 B.R. 698, 701 (Bankr. D. Colo. 2004); *In re Rohl*, 298 B.R. 95, 100 (Bankr. E.D. Mich. 2003)(denying conversion based on debt at the time of filing, not after post-filing debt forgiveness); *In re Faulhaber*, 269 B.R. 348, 353 (Bankr. W.D. Mich. 2001)("*Pearson* also prohibits the bankruptcy court from taking into consideration events which occurred subsequent to the petition date in evaluating the debtor's eligibility for Chapter 13 relief."); 2 Collier on Bankruptcy ¶109.06[3] ("cases have held that the petition date is the crucial reference point for determining eligibility.")

UST believes it is appropriate to count the individual Creditor Investor claims when assessing the Debtors' eligibility. UST further asserts that the Debtors filed their petition in bad faith and attempted to exploit the bankruptcy process. It also points to certain prepetition actions of the Debtors as factors, such as actions alleged to have hindered state court proceedings, and further suggests that Debtors bankruptcy filing is a means to avoid civil liability related to the AEM Services Ponzi scheme. At the hearing, the court asked if the UST had evidence to present that Debtor-Husband was actually a knowing participant in the Ponzi scheme, rather than an unknowing dupe and victim as he has maintained throughout this proceeding. The answer was essentially that they had no such evidence, but wanted to take discovery, primarily a deposition of the Debtor-Husband. That request was granted.

Here, at the time of filing, Debtors valued the Creditor Investor claims at $0.00, and the Creditor Investors filed claims totaling $21,225,199.99. However, to the extent that these claims

attached documents,[13] they all reflect that the Cognovit Promissory Notes are to be paid by AEM Services and Mark Dente (who signed the notes individually). [Claims ##1-1 (part 2 at 16-19); 2-1 (Part 2); 3-1 (Parts 2-4); 4-1 (Parts 2-4); 7-1, at 4-7; 16-1 (Part 2); 17-1 (Parts 2 & 3); 18-1 (Part 2); 19-1 (Part 2); 20-1 (Part 2); 21-1 (Part 2); 23-1, at 8-9]. None of the Notes reflect a signature by Debtor-Husband, not even in a representative capacity.

Because the Debtor-Husband was not a signatory to the Cognovit Promissory Notes, there appears to be no basis for contractual liability on the part of Debtor-Husband. *See*, O.R.C. §1303.41(A) ("A person is not liable on an instrument unless the person signed the instrument or the person is represented by an agent or representative who signed the instrument, and the signature is binding on the represented person pursuant to section 1303.42 of the Revised Code."); *see also*, Official Comment 1 to §1303.41 ("Obligation on an instrument depends on a signature that is binding on the obligor."); 72 O.Jur.3d Negotiable Instruments and Other Commercial Paper, §516 (2024)("Under Article 3, a person is not liable on an instrument unless the person signed the instrument . . . ."); *and see*, *In re Baird*, 228 B.R. 324, 129-31 (Bankr. M.D. Fla. 1999)(a debt based on a breach of contract claim was contingent because the debtor was not a party to the contract even though the creditor alleged in state court that the debtor was liable for the breach of contract).

Collier states that "Debts owed by related entities, but not by the debtor or debtors filing the case, are not counted." 2 Collier on Bankruptcy, ¶109.06[2][a] (16th ed. 2024)(citing *Ho v. Dowell (In re Ho)*, 274 B.R. 867 (9th Cir. 2002)(debt owed by corporation of which debtor was principal not counted)). Thus, the fact that the Debtor-Husband is a "Vice President" of AEM Services does not provide a basis for liability.

Similarly, the Sixth Circuit has noted: "Ohio's general rule that '[a]n agent who acts for a disclosed principal and who acts within the scope of his authority and in the name of the principal is ordinarily not liable on the contracts he makes' because the third party intended to deal with the principal, not the agent . . . ." *Soberay Mach. & Equip. Co. v. MRF Ltd., Inc*., 181 F.3d 759, 767-68 (6th Cir. 1999)(citation omitted). While there are exceptions to this rule, none of the claimants appear to rely upon those exceptions.

Thus, for the Creditor Investor claims, any liability on the part of Debtor-Husband would have to sound in tort.

---

13/ Claims 8-1 and 15-1 did not attach any documentation.

There is sufficient evidence in this case, for purposes of Section 109(e), that tortious conduct occurred in relation to the operations of AEM Services. Although it may be technically correct to say that it was an "alleged" Ponzi scheme at the time of the hearing on this matter, a Receiver has been appointed by the state court based on the allegations of fraud. However, as of the hearing on UST's Motion, that tortious conduct has been shown – in a manner sufficient to cause a court to take action – as to a number of entities, including AEM Services, Mark Dente, and related entities. [Doc. #344, pp. 1-2, n.1]. But not as to Debtor-Husband. [*Id.*].[14]

While the common law doctrine of *respondeat superior* generally renders a principal liable for the torts committed by its agent within the scope of the agent's duties, the reverse is not ordinarily true. Generally, an agent is not liable for the torts of the agent's principal. *See e.g.*, *Green v. Century 21*, 740 F.3d 460, 466 (6th Cir. 1984)("The law does not, however, make the two sales agents liable for discriminatory acts by their principals . . ."); *In re Mktg. & Creative Sols., Inc.*, 338 B.R. 300, 306 (B.A.P. 6th Cir. 2006)("Under Ohio's general rules of agency, 'an agent who acts for a disclosed principal and who acts within the scope of his authority and in the name of the principal is ordinarily not liable on the contracts he makes because the third party intended to deal with the principal, not the agent.'")(quoting *Soberay Mach. & Equip. Co. v. MRF Ltd.*, 181 F.3d 759, 768 (6th Cir. 1999)); *In re Lernout & Hauspie Securities Litigation*, 236 F.Supp.2d 161 (D. Mass. 2003)("[Defendant] properly notes that the theory of vicarious liability is inapplicable, as this theory holds principals liable for the acts of their agents, not agents liable for the acts of their principals.").

In order for Debtor-Husband to be liable on the Remaining Claims filed by the Creditor Investors, they would need to show what the Debtor-Husband has consistently denied – that he knowingly (or perhaps recklessly or negligently) participated in the alleged Ponzi scheme.

Collier on Bankruptcy states:

> In deciding whether a claim is noncontingent, and therefore counted toward the debt limit, courts have generally ruled that if a debt does not come into existence until the occurrence of a future event, the debt is contingent. A claim is contingent as to liability if the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event.

2 Collier on Bankruptcy, ¶109.06[2][b] (16th ed. 2024).

---

[14] The existence of the automatic stay plays a part in this fact, of course.

A debt must also be liquidated to count toward the debt limit. Although for purposes of this section, "liquidated" is not defined, courts have generally held that a debt is liquidated if its amount is readily and precisely determinable, as where the claim is determinable by reference to an agreement of by a simple computation. For example, a tort cause of action against the debtor for personal injuries, pain and suffering would obviously be an unliquidated claim, and not counted no matter how large the potential damages.

2 Collier on Bankruptcy, ¶109.06[2][c]; *see also*, *In re Beach*, 2024 WL 2263490 at *5, 2024 U.S. Dist. LEXIS 26900 at *11 (D.N.M. Feb. 15, 2024)("Another example is 'the commission of an alleged wrongdoing, where it is presumed to have been contemplated by the parties that the alleged tortfeasor would be liable only if and when his act or omission were established as a tort and damages determined by a competent tribunal.'")(quoting *In re Lambert*, 43 B.R. 913, 922 (Bankr. D. Utah 1984); *In re Smith*, 365 B.R. 770, 783 (Bankr. S.D. Ohio 2007)("The classic unliquidated debt - a claim based on tort or quantum meruit - lies at the other end of the spectrum."); *In re Arcella–Coffman*, 318 B.R. 463, 473 (Bankr. N.D. Ind. 2004)("The determination of both liability and damages ordinarily requires the exercise of judgment by the factfinder, claims based on tort … are generally unliquidated, unless they have been resolved by a judicial decree or otherwise."); *In re Allen*, 241 B.R. 710, 714 (Bankr. D. Mont. 1999)($3,025,000 claim for prepetition assault and battery is "clearly unliquidated and contingent and thus cannot be factored into the eligibility criteria of 11 U.S.C. §109(e).").

Collier further states:

A debt is not liquidated if there is a substantial dispute regarding liability or amount. Although there may be issues whether a substantial dispute exists, the Court of Appeals for the Ninth Circuit has held that one exists when determination of liability requires an extensive and contested evidentiary hearing involving substantial evidence.

2 Collier on Bankruptcy, ¶109.06[2][c]. Under the criteria set forth in Collier, it appears that the Creditor Investor claims would not be required to be counted toward the §109(e) debt limit.

However, the case law on these types of claims is far from settled. In part, this is because bankruptcy courts have been given "gatekeeping" responsibilities for Chapter 13 without clear statutory guidance as to where to draw the line on difficult legal and fact specific issues. A court

might, for example, hold that a tort claim for rear-ending another driver at high speed, with documented medical bills over $3 million dollars, was disqualifying, even though no action had been filed prior to the filing of the Chapter 13 case. On the other hand, a personal injury complaint filed in state court prior to filing might be disregarded if it was based on "debtor wrongfully beamed thoughts into my head," even with undisputed evidence regarding the $3 million dollar cost to plaintiff for tin foil supplies.

The UST appears to argue that when the issue is raised, the court has no discretion but to allow claims – no matter how dubious – if all of the actions occurred pre-Petition, arguing:

> 29. A noncontingent debt is one where "all of the events giving rise to liability for the debt occurred prior to the debtor's filing for bankruptcy." *In re Glance*, 487 F.3d 317, 322 (6th Cir. 2007) (quoting *In re Mazzeo*, 131 F.3d 295, 303 (2d Cir. 1997)). A debt does not need to be reduced to judgment to be noncontingent—all that matters is whether the liability originated prior to the petition date. Mazzeo, 131 F.3d at 303. Also, that a given debt is disputed does not render it contingent. *In re Bosserman*, 587 B.R. 668, 677 (Bankr. N.D. Ohio 2018).

> 30. In Ohio, the cause of action, i.e., the basis for liability, of a tort accrues "at the time the tortious conduct takes place." *AKA Enters., Inc. v. Hartzell Propeller, Inc.*, No. 3:16-CV-82, 2017 WL 751312, at *3 (S.D. Ohio Feb. 23, 2017). Therefore, tort claims against a debtor based on alleged prepetition tortious conduct are noncontingent because the conduct giving rise to the debt occurred prepetition, even if a claim was not reduced to judgment before the petition date.

> 31. Courts have held that such tort claims are noncontingent debt.[15]

Thus, it appears that the UST is arguing that bankruptcy courts are not to utilize their discretion, experience or judgment as to claims, but rather apply a simple test based solely on whether the events – that could eventually lead to a finding of liability – occurred pre-petition. Using the absurd example above, it would appear the claim that a debtor wrongfully beamed thoughts into creditor's head – if the "events" occurred pre-petition, and the $3 million dollars in tin foil (to mitigate the effects) was bought pre-petition – then the alleged thought-beaming Chapter 13 debtor would have to have his or her case dismissed under Section 109(e).

---

15/ The UST's Supplemental Brief cites a number of tort cases where the courts had held the debt non-contingent. [Doc. #384].

This court disagrees for a number of reasons. First would be the holding in *Pearson*. The dispute in *Pearson* was over the purchase of a portion of Comprehensive Accounting Corporation's accounting practice by Timothy R. Pearson, Inc. in 1981, with the purchase price secured by a security interest in accounts receivable of the corporation and personal guarantees from the Pearsons. *Pearson*, 773 F.3d at 751. There was a default, and litigation was commenced, but the parties switched tracks based on an arbitration clause in the purchase agreement. *Id.*, at 751-52. On December 20, 1982, the creditors in *Pearson* were rendered an arbitration award of $127,450.12, in excess of the unsecured debt limit at the time of $100,000. *Id.* The Pearsons' Chapter 13 case was filed on March 18, 1983. *Id.*, at 752. Nothing in the decision states a date when the arbitration award was confirmed by the state court, and it may be that confirmation of the award was stayed by the filing of the Pearsons' Chapter 13 case.

The Pearsons' schedules initially listed the debt to Comprehensive as "having both a secured and an unsecured debt, but stated that the amount of each was unknown and in dispute." *Id.*

> On May 23, 1983, the Pearsons amended their Chapter 13 statement listing Comprehensive as an unsecured creditor with a claim of $127,450.12. The Pearsons amended the statement to comport with the proofs of claim filed by the creditors, but reserved the right to contest the validity and amount of any such claim. At the confirmation hearing on May 25, 1983, Comprehensive objected to the confirmation of the Pearsons' Chapter 13 plan on the ground that the Pearsons did not meet the threshold eligibility standard set forth in section 109(e) of the Bankruptcy Code. Comprehensive contended that the Pearsons had more than $100,000 of noncontingent, liquidated, unsecured debt as shown by the amended Chapter 13 statement.

*Id.*

The dispute in *Pearson* centered on whether the debt was a liquidated unsecured debt at the time of filing. After surveying the case law, the *Pearson* court held:

> Another view is that a court should rely primarily upon the debtor's schedules checking only to see if the schedules were made in good faith on the theory that section 109(e) considers debts as they exist at the time of filing, not after a hearing. *See In re King*, 9 Bankr. 376 (Bankr.D.Or.1981). We adhere to this construction as more harmonious with congressional intent and with the statutory scheme. First, section 109(e) provides that the eligibility computation is based on the date of filing the petition; it states nothing about computing eligibility after a hearing on the merits of the claims. Second, the fact that evidence must be taken to determine the

14

amount of the claim indicates that, until then, the claim was unliquidated. Third, the Bankruptcy Code contemplates that a Chapter 13 plan be adopted and implemented in a short period of time.

*Id.*, at 756.

This holding was distilled into the oft-quoted: "Chapter 13 eligibility should normally be determined by the debtor's schedules checking only to see if the schedules were made in good faith." *Id.*, at 757. Even though there had been a pre-petition arbitration award, and the Pearsons had amended their schedules to show an unsecured debt of $127,450.12 – an amount clearly over the debt limit at the time – *Pearson* held:

At the same time, we believe it is wholly sufficient for the bankruptcy judge to have examined the petition and from that to have concluded that a good faith claim of eligibility was made. While the amount owed by the Pearsons to Comprehensive was probably established as $127,000 by the arbitration proceedings, it by no means indicates that the debt was unsecured to that extent or that the Pearsons would be ultimately held liable for that amount.

*Id.*

*Pearson* also stated: "This threshold eligibility determination for Chapter 13 is in many respects like the threshold subject matter jurisdiction determination in diversity cases where the . . . minimum amount in controversy is challenged." *Id.* "The Supreme Court recognized that the exact amount in controversy could not always be ascertained, and held that the amount claimed in good faith by the plaintiff controls unless it appears to a legal certainty that the claim is for less than the jurisdictional amount or the amount claimed is merely colorable." *Id.* (quoting *St. Paul Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 58 S. Ct. 586, 82 L.Ed. 845 (1938)).[16]

Turning back to the specifics of eligibility under Section 109(e), *Pearson* stated:

---

16/ More recently, the Supreme Court has held that in a removal situation, "a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89, 135 S. Ct. 547, 554, 109 L.Ed.2d 495 (2014). The criteria for actions originally filed in the District Court does not appear to have changed substantially since *Pearson*: "A court must not dismiss an action for failure to meet the amount in controversy requirement unless it appears 'to a legal certainty that the claim is really for less than the jurisdictional amount.'" *Hibbett Sporting Goods, Inc. v. ML Georgetown Paris, LLC*, 2019 WL 475001 at *3, 2019 U.S. Dist. LEXIS 18826 at *8 (E.D. Ky. Feb. 6, 2019)(citing *Saglioccolo v. Eagle Ins. Co*., 112 F.3d 226, 233 (6th Cir. 1997), and quoting *Basicomputer Corp. v. Scott*, 973 F.2d 507, 510 (6th Cir. 1992)).

That a good faith claim of eligibility was made is fortified by the fact that Comprehensive filed its claim as a secured claim. Plainly, the Pearsons could in good faith have considered that their unsecured liability was at least in dispute and could reasonably have amounted to less than $100,000 should Comprehensive and the other creditors succeed in obtaining partial or full satisfaction of their claims from the property against which they claimed a security interest.

. . . [T]he fact that some later resolution of the conflict might render more certain the precise nature of the debt itself and the extent to which it is ultimately found to be secured is relatively immaterial in determining the debtors' financial condition and Chapter 13 eligibility on the date the petition was filed. The bankruptcy judge and the district judge both looked realistically to the state of the debtors' affairs as it reasonably appeared on the date of filing. We do not believe that the statute requires any more.

*Id.*, at 578.[17]

Thus, under this court's reading of the holding in *Pearson*,[18] the court is not required to simply count "tin foil hat" tort cases, without analysis, in calculating Chapter 13 eligibility under §109(e). Instead, *Pearson* directs the court to carry out its gatekeeping functions by looking at "the debtors' affairs as it reasonably appeared on the date of filing." *Id*.

Moreover, one of the cases that the UST most heavily relies upon, *In re Glance*, gives the reason why simply asserting that "all the events giving rise to liability for the debt occurred prior to the debtor's filing for bankruptcy" is not sufficient to require the inclusion of a "tin foil hat" claim:

Glance responds that we should not treat "debts" and "claims" the same in this setting. Equating the two, he says, will "enable a creditor to have a debtor's case

---

17/ One might argue that *Pearson* is an old case, and that it should not be followed in light of subsequent developments in the law, including published Sixth Circuit cases. However, the rule in the Sixth Circuit is when "[f]orced to choose between conflicting precedents, we must follow the first one." *United States v. Jarvis*, 999 F.3d 442 (6th Cir. 2021); *RLR Investments, LLC v. City of Pigeon Forge, Tennessee*, F.4th 380, 390 (6th Cir. 2021); *Peyton v. Akers*, 2024 WL 1530804 at *11, 2024 U.S. Dist. LEXIS 64548 at *24 (E.D. Ky. April 9, 2024).

18/ By upholding the bankruptcy court's reliance on the original schedules, the *Pearson* court was not required to address the fact that the Pearsons had personally guaranteed the debt that was the subject of the $127,450.12 arbitration award [*see e.g.*, *In re Winters*, 2012 WL 1067696, 2012 Bankr. LEXIS 1030 (Bankr. E.D. Tenn. March 12, 2012)(holding personal guaranties were liquidated, noncontingent unsecured debts)]; that the "collateral" securing the loan belonged to a separate business entity, not the Pearsons [*see e.g.*, *Fuson*, 404 B.R. at 876 (to be a secured debt of the debtor, collateral had to be property of debtor's bankruptcy estate)]; and the absence of any evidence that the collateral had actually been applied to reduce the $127,450.12 at the time the case was filed [*see e.g.*, *In re Bello*, 609 B.R. 695, 701 (Bankr. E.D. Mich. 2019)(unless funds held by the court to pay the judgment had actually been applied to the debt, the amount of the debt could not be reduced for purposes of §109(e))].

16

dismissed by merely filing a claim for an amount that exceeds the limits ... regardless of whether the creditor's claim has any legal basis." . . . . A second obstacle is that the eligibility requirements of § 109(e) create a gateway into the bankruptcy process, not an ongoing limitation on the jurisdiction of the bankruptcy courts. "Chapter 13 eligibility should normally be determined by the debtor's schedules checking only to see if the schedules were made in good faith." *In re Pearson*, 773 F.2d at 757. Because a debtor cannot fairly be accused of bad faith for omitting a creditor's demand that has no "legal basis," we are hard pressed to foresee when or how Glance's scenario would arise. A third obstacle is that a creditor's demand without "any legal basis" is not even a "claim" under the Code. One cannot have a "right to payment" (and thus a "claim," 11 U.S.C. § 101(5)) absent at least some "legal basis." And if such a demand is not a "claim," it is not by Glance's own logic a "debt" that could render a debtor ineligible for Chapter 13.

*In re Glance*, 487 F.3d 317, 321 (6th Cir. 2007).

That is the situation here. Simply disputing a debt does not push a debt out of the §109(e) calculation. But, if a debtor can show that there is a genuine and substantial issue as to whether or not there is a 'legal basis' for liability, *Glance* makes it clear that the listing of such an obligation as contingent, unliquidated and having an amount owed of $0.00 would be a filing made in good faith under *Pearson*.

While the fact that a debt is "disputed" by the debtor is legally meaningless in this context, it is still difficult to see where clear lines are to be drawn between the assertion that debts are non-contingent if all of the events giving rise to liability occurred pre-petition and where, in contrast, a claim has no "legal basis" under *Glance*. However, a claim being non-contingent is, at best, only half of the equation. Another part of the equation is the question of whether the claim is liquidated. But, the more fundamental question under *Pearson* is whether there is even a basis for the court to move off of the debts as they were listed in the debtor's schedules.

This case is unusual in that it deals with allegations of tort liability, to be viewed as of the time of filing, but now seen through the lens of a case that is more than a year old. Most of the Creditor Investor claims that were filed have been disallowed or voluntarily dismissed. By the court's count, the Debtors are currently 18-0. None of the Creditor Investor claims that Debtors objected to have, as yet, been allowed. None of the Creditor Investor claimants has, as yet, sought summary judgment on the validity of their claims.

While the remaining claims may eventually be held to be valid claims in the Debtors' Chapter 13 case, the initial question is: was the scheduling of the claims related to AEM Services as contingent and unliquidated either done in bad faith, or was designating them as such factually wrong? First, there appears to be a good faith basis, as set forth in Collier, and the admittedly mixed bag of case law, for listing the AEM Services related claims as contingent and unliquidated. Importantly, there is no evidence of direct contractual liability, or vicarious liability, and there has been no documentary evidence presented, to date, that would support claims that Debtor-Husband induced investments through knowing misrepresentations, or actual participation in the Ponzi scheme by Debtor-Husband.

The Debtors have sat for depositions, negotiated with the Receiver, and prosecuted their Chapter 13 case with an eye toward achieving plan confirmation, despite the many obstacles inherent in the situation that they are addressing.

These facts inform the court's view of the Debtors' Schedules at the time they were filed. Accordingly, the court finds that the listing of Creditor Investors claims as "contingent" and "unliquidated" was not done in bad faith. The fact that so many potential creditors were listed as being owed "$0.00", for notice purposes, raised questions. However, to date, there has been nothing filed with this court that would allow a determination that the listing of these potential claims was factually incorrect or filed in bad faith. Therefore, for purposes of §109(e), the court finds that the listing of the Creditor Investor claims in the amount of "$0.00," together with the designation of those creditors' potential claims as "contingent" and "unliquidated," was filed in good faith. Thus, under *Pearson*, it is appropriate for the Debtors' designations regarding the debts to control for purposes of §109(e).

Looking realistically at the state of the Debtors' affairs as it "reasonably appeared on the date of filing,"[19] setting the value of the claims at $0.00 was not demonstrably wrong. *See, In re Mannor*, 175 B.R. 639, 641 (Bankr. E.D. Mich. 1994)(one of the exceptions to "normally" accepting schedules at face value is where it appears to a legal certainty that debtors' schedules are wrong). Nothing that has been filed here is the equivalent of, for example, a creditor attaching a copy of a judgment to a proof of claim for a debt that the debtor had listed as "unliquidated." *See, In re Bowes*, 2009 WL 2983036 at *4, 2009 Bankr. LEXIS 2884 at **9-10 (Bankr. N.D. Ohio Sept. 14, 2009)(existence of a judgment renders debt non-contingent and liquidated); *see also, In*

---

19/ *Pearson*, 773 F.2d at 758.

*re Odette*, 347 B.R. 60, 62 (Bankr. E.D. Mich. 2006)(even where the schedules were filed in good faith, the court can include additional debts to the extent there is a "'legal certainty' that such are debts of the debtors").

Further, the case law dealing with §109(e) reflects a need to balance between blind acceptance of either what a Chapter 13 debtor puts in the schedules, or what creditors assert when they file proofs of claim:

> The schedules—even if filed in good faith—are not dispositive of a debtor's eligibility for Chapter 13 relief. Thus, a bankruptcy court is not bound by how the debtor schedules a creditor's claim. . . . Nor must a bankruptcy court accept a creditor's characterization of its claim.

*In re Smith*, 365 B.R. 770, 781 (Bankr. S.D. Ohio 2007). Instead, the court must make "'an independent determination' as to whether the claim was legitimately contingent and unliquidated." *In re Bosserman*, 587 B.R. 668, 674 (Bankr. N.D. Ohio 2018)(citing cases).

This is, of course, without prejudice to the outcome of the pending claims litigation. The eligibility determination under §109(e) cannot be held hostage to the claims allowance process. *Perkins*, 2009 WL 2983034 at *2, 2009 Bankr. LEXIS 2885 at *5 ("the eligibility determination should not depend on the claims allowance process"). On the other hand, nor can a determination of debtor eligibility under §109(e) interfere with the rights of creditors to file and seek the ultimate allowance of their claims.

While it has not been raised, the claim of the Receiver presents a separate issue. It appears – and at this point it has not been disputed – that Debtors were "net winners" in their dealings with AEM Services. Near the end of AEM Service's operations, Debtors were deeded real estate – a house referred to as the "Shady Knoll Property" – which had substantial value. While the full "net winner"/"net loser" analysis in a complex Ponzi scheme would not have been "readily calculated," for purposes of determining whether the debt is "liquidated" the transfer of the Shady Knoll Property appears to be part of a non-contingent (as to liability) claim, and is – arguably – liquidated to the extent of the value of the house the Debtors received from AEM Services. *See*, *In re Glance*, 487 F.3d 317, 321 (6th Cir. 2007)("the Code provides that a 'claim against the debtor' includes [a] claim against property of the debtor.").

However, even if the court were to use the full value of the house, which appears to have been about $525,000 based on the price allegedly made part of a purchase agreement executed on September 6, 2019 [Doc. #344, p. 4], the Debtors would still be well under the debt limit. Adding $525,000 to the amount scheduled as liquidated and non-contingent on the schedules ($414,007.52), results in a total of $939,007.52, still well below the debt limit of $2,750,000 in noncontingent, liquidated debts.

While more subject to doubt based on "ready calculation" issues, the Debtors listed income in the form of "Interest/Dividends – AEM Services" of $313,839 for 2020, and $282,570 for 2021. [Doc. #1, p. 267, Part 2, ¶5]. However, even if those amounts were added to the listed debts, coupled with the value of the Shady Knoll Property, the total debt would be: $414,007.52 + $525,000 + $313,839 + $282,570 = $1,535,416.52, still well below the eligibility ceiling of $2,750,000.

Finally, the denial of UST's Motion to Dismiss based on eligibility does not prevent later dismissal of this case if evidence of knowing participation in the alleged Ponzi scheme is uncovered. If convincing evidence of knowing participation were found, §1325(a)(3), requiring that a Chapter 13 Plan be "proposed in good faith," and §1325(a)(7), requiring that "the action of the debtor in filing the petition was in good faith," could provide a basis for denying confirmation. Section 1307(b)(5) provides for dismissal based on an inability to propose a confirmable plan: "[O]n request of a party in interest or the United States trustee . . . the court . . . may dismiss a case under this chapter . . . for cause, including – (5) denial of confirmation of a plan under section 1325 of this title and denial of a request made for additional time for filing another plan or a modification of a plan."

Here, Debtor-Husband has consistently represented to this court, though counsel, that he had no knowledge that AEM Services was operating a Ponzi scheme. It is the court's understanding that similar representations were made under oath in depositions. To the extent those foundational representations are proven to be false, it is difficult to see how the Debtors could meet their burden of proof that this Chapter 13 case was filed in good faith, or that any Chapter 13 Plan was proposed in good faith.

**THEREFORE**, based on all of the foregoing reasons and authorities, good cause appearing,

23-60403-jpg    Doc 418    FILED 06/28/24    ENTERED 06/28/24 16:35:47    Page 20 of 21

**IT IS ORDERED** that the UST's Motion to Dismiss Case [Doc. #352] be **DENIED** to the extent it seeks dismissal of this case based on ineligibility under 11 U.S.C. §109(e). Debtors' case will be continued for further proceedings by separate order of the court.